Good morning, Your Honors. My name is Jake Holdreth. I'm here for Minneapolis. I represent SurModics, the appellant, which is the inventor of the technology that's the subject of the license in this case, and the licensor. The license is an agreement by which Pacesetter purchased the right not to be sued for patent infringement. And the right to sue for patent infringement approves for making or selling a product. So the law is clear that in this case, had there been no license, Pacesetter can be sued for products it made up to midnight on the last day of the patents, no matter what it sells. We could sue today for patents made on the last day of the patent term. So the question is, does the agreement contain any language which limits the right to collect royalties for those net sales to a specific time period? In this case, the royalty is established in Exhibit B. It's in the excerpts of the record at page 80 and page 83, which accrues royalties on net sales of licensed products. And that language contains no limitation to when the products are sold. It simply says if there's a licensed product and a net sale of that licensed product, a royalty is payable. The language that Pacesetter is focused on is found in the agreement, and it states that for each quarter during the term of the agreement, there is a license. That language neither requires nor prohibits the payment of royalties on net sales for products that were made while the patents were in force but sold after. The controlling language is the royalty-triggering language, which is net sales of all licensed products. Pacesetter invited the error that the district court made when it suggested that the court should limit royalties to sales of products actually sold during the term of the agreement. Well, let's go. Can I go through the language with you? Royalties is Section 5, right? Yes, sir. And that's that we paid during the term of this agreement, right? It says for each quarter a royalty is paid during the term of the agreement. That's right, Your Honor. So that's a limit as to when royalties can be paid, is it not? It is a limit to royalties for quarters that occur during the term of the agreement. And this language sets up a conventional scheme of accounting for royalties on a quarterly basis. But is there any other place where royalties are stipulated, provided for? Yes, sir. In the extended record at page 80, which is referenced in this section, you find attachment B1. And on, for example, extended record page 80, there is a Section 5 entitled Royalty Payments. And that section says CRMD, that's Pacesetter, shall pay to Cermodax a royalty for the license to the patent rights and know-how granted herein. And then it stipulates in Section A that earned royalties are on net sales of licensed products. And it does not say there that the sales must occur during the term of the agreement. Yes, but the only place where royalties are granted is Section 8, isn't it? I believe the Court is referring to Section 5. 5, I'm afraid. Extended record at page 64. That is the royalty, that is a provision that deals with how royalties are calculated and audited, yes, sir. Well, you're saying how they're calculated. I'm saying the only place I see royalties being agreed to is in Section 5. Respectfully, Your Honor, I think that that Section 5 incorporates attachments B1 and B2. And that's stated at the bottom of that first paragraph under royalties. That's the minimum royalties. Well, it says it's the greater of the royalties of paragraphs 5A or 5B as set out in the respective attachments B1 and B2. So that language refers to the language I just read to the Court, which makes royalties payable on net sales of licensed products. Why don't you – I understand both sides here think that this language is unambiguous. Is that your position? We believe the language is clear. It incorporates the background – Unambiguous for purposes of contract interpretation canons. Yes, Your Honor. Okay. Because to me it's – it seems somewhat ambiguous. And then I would – having practiced patent law and worked on patent cases, I don't understand how this agreement makes sense, because unless – I mean, almost it doesn't make sense unless construed your way. I'm just going to tell you that, because when you violate a patent, you infringe a patent if you make a product you don't have the license to. And it doesn't make any sense to me that any patent lawyer would draft an agreement that would not anticipate royalties for products made during the licensed term. It just defies common sense to me. You don't do it. I mean, you wouldn't have done it. But yet you're taking – but I can't go there, because you're taking the position that this agreement is absolutely unambiguous. The parties did put extrinsic evidence in the record. The most relevant extrinsic evidence is that the actual payment of royalties that occurred on April 25th of 2008 occurred 30 days after the expiration of the last patent on March 25th. So clearly the parties contemplated and agreed and, in fact, conducted themselves accordingly that payments would occur after the last patent expired. So I'll share – I don't usually do this, but I'll share a little experience. When I was interviewing for district court in the White House Counsel's Office, there was a young person in the committee that was interviewing me, and I was conducting – I was overseeing, presiding over a huge patent case. And the infringement had been – the patent had expired, but the infringement had occurred before the patent had expired, and they were seeking payments, seeking damages for the infringement. And this one young person in the White House Counsel's Office just looked at me blankly and said, how can you sue if the patent's expired? I'm like, well, okay, so you're interviewing me for this job? This doesn't make any sense. But, I mean, to me, just the whole tenet of patent law is that that's what you're licensing. Exactly, Your Honor. But you're not making that argument. That's what I found very frustrating about this. Well, I think we are. I mean, the background understanding of patent law is incorporated into the agreement because the license says it is a license on products which would infringe when made, used, or sold, but for the license. That incorporates 271, which says any product made during the term of the patents is an infringing product. And patent law absolutely tells us that when you make a product during the term of the patent, you cannot sell it later. We addressed that, for example, when we addressed the argument that case setter made based on the Supreme Court decision in the Sears and Roebuck case. That case stands for the proposition that after the patents expire, then the public may make the patent a product. However, if the public makes the patent a product prior to expiration, it's very clear in the net sales are payable on all licensed products. There is nothing in the language of the agreement that says the sales must occur during the term of the agreement. And I think case setter comes very close to admitting that when they feel obliged to insert the phrase actually sold during the term of the agreement into their arguments. If this agreement said net sales actually made during the term of the agreement, we would have a much more significant problem. This language doesn't say that. It says for quarters during the agreement, royalties are payable. And we're only asking for royalties for quarters of the agreement, products made during the term of the patents. And we may be repeating ourselves here, but I guess I'm going to follow up or maybe even repeat the questions just noon and ask you. Section 5 of the agreement says case setter or St. Jude was required to pay a royalty. Correct? Yes, ma'am. All right. As in a single royalty. Am I – is that my – I would interpret a royalty as each licensed product generates a royalty payment.  For each quarter that occurred during the agreement. Correct? Yes, ma'am. Okay. So didn't St. Jude satisfy that obligation to pay a single royalty for the final quarter on April 25th of 2008? No, Your Honor, because the royalty is calculated on net sales of licensed products. So for each net sale of a licensed product, a royalty is generated. And that's shown in attachment B, for example, at an extended record at page 80, where the royalty is generated for each sale. And the agreement, in fact, contemplates that all of those royalties need to be paid, including after the term of the patents. And that's exactly what happened here on, for example, April 25th of 2008, after the patent set expired. Who drafted this language? It's not in the record. I believe it was mutual. The parties are not either asserting that one or the other is bound by contra preferentum or construing the language against the drafter. It might seem some lawyer drafted it. I'm sorry, Your Honor. Some attorneys, some patent attorneys. Some attorneys drafted this, certainly, yes. And they were certainly first in patent law when they drafted it. If I could just mention to the Court, the Court is aware, I'm sure, that the two cases which are most directly on point, the Forbeau and the SGK cases, came to the same conclusion as we are urging, that royalties are payable on products made during the patent term and sold afterwards. The Forbeau language is very similar to the language in this case. Those are certainly not binding on this Court, but form the background understanding that the parties would have had when they drafted the agreement. The understanding would be absent a specific limitation such as there was in the AM case. When you contract to pay royalties on net sales of licensed products, and licensed products are those made, used, or sold during the term of the agreement, you are committing to pay royalties on products made during the term of the patents and sold later. The AM case is unusual in that it contained a negotiated, stipulated capture period for sales. There is no such stipulated capture period in this case. And Judge Posner in the AM case even noted that that was an unusual case. Normally, products made during the patent term are infringing and would become royalty bearing. I'd only like to quickly then point out that there's an argument in the briefs that we did not cross-appeal the denial of our summary judgment motion. That's not correct. Our notice of appeal specifically does appeal from the denial of summary judgment for cermotics. What we're seeking from this Court is a remand with instructions that the judgment be vacated, that the district court enter partial summary judgment in our favor on liability, and hold a trial to establish damages. Unless the Court has questions, I'd like to reserve the little bit of time I have left. I just have another question. Before the license expired, did the auditors provide information about the quantity of licensed products that were made, or only about the quantity that were sold? The reports were specific to the products that were sold, which obviously had also been made before they were sold. We are only seeking the same relief here. The only thing we're seeking payment on is net sales. So the continuing audit statements we would like to see and be paid on are sales of those products which were made during the term of the agreement. It would be the exact same form of report. Okay. Thank you. Thank you. May it please the Court. Todd Mullin on behalf of Apelli Saint Jude Medical. Your Honor, this is not a patent case. This is a contract case. And under the plain and unambiguous language of paragraph five, the parties agreed that a quarterly royalty would be paid for each license granted, covering all licensed activity under the agreement, and that Saint Jude would pay a quarterly royalty for each quarter of each calendar year during the term of the agreement, which expressly terminated with the expiration of the patents, somatic patents. You find this in paragraph five, six, and eight. The parties negotiated paragraphs five, six, and eight, and they're sophisticated parties, and they had this negotiation six years before the last relevant patent expired. Sir, why would any patent owner forego royalties on products that were made while the license existed that were sold later? Your Honor, it's an arm's-length negotiation. I get that. And there's two ways of doing it, and it's not foregoing. Your question is loaded with this concept of foregoing. There's no obligation under patent law, and the Federal Circuit made this absolutely clear when it transferred this case and held that there was no subject matter jurisdiction. The patent law does not obligate any payment after the expiration of a patent. It has to be contracted for. Patent law, just because there are patents. But you could sue for damages if you made a product while the patent was unexpired, even though you sold it later. Absolutely. But there's no obligation to have a royalty-bearing license. You can have non-royalty-bearing licenses. Right, but what's the incentive for that? Well, I'll explain it to you in just one example. There are two different ways of doing a license agreement. You can do it for a term, a period of time, or for a number of products. You could do it for one year, ten years, or for the life of the patent. That's a duration license. Or a license could be for 1,000 units, 10,000 units, or all units made under the agreement. Here's the difference, and it's a significant difference between those two different types of licenses. Under the agreement for a duration of time, the licensee is making royalty payments for the right granted by the license. And all that bundle of rights. The number of units made during the life of the patent is immaterial to the royalty obligation. In contrast, if you're having a royalty obligation tied to the products themselves, the licensee must account for the number of units made during the term of the agreement in order to calculate and verify the royalty obligation, especially when the patent were to expire. Paragraphs 5 and 6 control here, and they're not ambiguous. Paragraphs 5 tell you what type of license it is. Paragraph 5 states St. Jude was paying for each license granted. It doesn't say in the first sentence of paragraph 5, which, Your Honors, I recognize is the royalty obligation. The first sentence is the only paragraph, is the only provision in the entire agreement that imposes a royalty obligation on St. Jude. And that first sentence tells you it's for each license granted and all the rights granted by those licenses. It doesn't use the word license product. Right there, right there, you'll see it, Your Honor. It says license granted, not license products. And then it tells you it's for a set period of time, the term of the agreement. The term of the agreement is defined in paragraph 8A. St. Jude's royalty obligation extended from the effective date of each license to the expiration of the last to expire patent covering a product, at which time the patent license and the corresponding royalty obligation terminated. Aren't you reading out entirely the language and attachment B-1 and B-2? Oh, no, Your Honor. I'll jump ahead to that. I'll jump ahead to that. If you look at provision 5, there are two sentences. Okay. Can I just, the way I read for each license granted herein, that that's a timing, that they're supposed to pay for each quarter of each calendar year, that that's when they pay on a quarterly basis. But the calculation of the royalties looks to me to be on page B-1, I mean, in the B attachments, B-1 and then B-2. I think the calculation is. And that's the second sentence in paragraph 5, right? Right at the beginning of paragraph 5, you have a first sentence and a second sentence. The second sentence is subordinate to the first sentence. The second sentence says, such royalty payment. It's describing what's required under the first sentence, meaning it's subordinate to. But it explicitly references B-1 and B-2. Right. So you have to read it in conjunction. Absolutely. I want to give meaning to both sentences. They're giving meaning only to the second sentence. They're erasing for each license granted and they're erasing during the term of the agreement. They're erasing those as if they're not there. Those are the limitations that he's asking for and the trial judge found. And they're right there and agreed to. And it's for each license granted, not for licensed products. And you pay a quarter of the royalty during the term of the agreement. And then you reference paragraph 8 and 25 and they tell you when the term ended. Absolutely, you don't have to yell. I'm sorry. In fact, I understand better if you don't yell. Absolutely. And in paragraph, the second sentence explains how you calculate what's due each quarter. You're either going to pay a quarterly minimum royalty. If you have a lot of licensed products that were sold, you will pay the royalty based on net sales for that quarter. So you're going quarter by quarter and you're either paying a minimum royalty that quarter or if you have a lot of sales and you get over the minimum amount, then you pay for that quarter and all activity in that quarter, the sales based on net, the royalties based on net sales. Okay, but under your reading of this, your company could have made and stockpiled tons of product just waiting for the patent to expire or the agreement term to expire and then sold it all later, thereby escaping any obligation to pay any royalties whatsoever. That's not correct. And here's why. That was the rationale used in the two New York decisions. And they felt that it was an unforeseen contingency, and that horrible suggested that they didn't intend that. Here we have just the opposite situation, Your Honor. And let me take pains. If you go through the agreement, you will see that the parties fully anticipated the expiration of these patents. It was done six years. It was renegotiated six years prior to the expiration, and there's several provisions in the contract that deal with the expiration of the patent and what happens when the patent expires. And there are inventory controls and minimal. There's three things I'll point you to where that horrible cannot happen under this contract. One, there are minimum royalties. That did not exist in either of the agreements that were in the New York decisions. The minimum royalties guaranteed that there would be a royalty paid if we sold no product, so they were definitely getting a minimum royalty. Why is all this blacked out? Pardon? The terms are redacted. The actual numbers have been redacted for privacy reasons. There's an unredacted version that's in the record that was referenced by they included in reference. Your Honor, the second reason why there can't be a stockpiling of inventory is because this contract gave Cermatics the right to say no if we were demanding more inventory than our actual needs. They were only obligated to supply a reasonable quantity of the coding material. They were in charge of what was reasonable, and they could juxtapose it to our actual needs. If they saw us stopping sales, they could stop sending quantities. There could be no they had a self-help remedy under the contract to prevent the stockpiling of. Where is that? That is in, I wish I had it on the top of my head. It's discussed at length in our opposition brief, Your Honor. I don't have it at my fingertips. I think what also is important in this case is paragraph 6. Paragraph 6 is entirely inconsistent with their theory. Not only would they have to erase the first sentence of paragraph 5 in support of their argument, they would have to make you ignore paragraph 6. Paragraph 6 begins by during the term of the agreement, you have a payment and a reporting obligation. After the term of the agreement, you don't have that obligation. Paragraph 6 says there's no obligation to report the units made, and there's no obligation to report what sold after the patents expired. Since there's no obligation to report what was made before the patents expired and no obligation to report what was sold after the patents expired, you can't audit. The auditors cannot come in and determine what is owed under their theory of the case. But I thought they did. I thought they determined, what, $3 million were owed? No, they actually determined $3 million as an estimate. If you look at their actual audit report, it says it's inconclusive because it didn't have the data. Because St. Jude, in the ordinary course of business, it wasn't obligated to keep. It wasn't obligated by this contract, and it doesn't do in the ordinary course of business. Track the units made so you can then determine the inventory at the time the patents expired and what was sold later. You can't take the invoices, match it to our inventory data, and come up with an amount, and that's what their auditors admitted. Their auditors admitted in their own audit that it was inconclusive, that they could not determine based on the data that was made available to them, which is what we had, what was owed. They only could do an estimate based on logic and reason. But unlike, and this is in contrast to what was owed prior to the patents expired, they got that down to the penny. There's no dispute that they had an auditing right to determine what was owed before the patents expired. But what they conceded is their auditing right did not cover what was owed after the patents expired. And if they wanted, what was necessary is an obligation to report and maintain records on products made during the term of the agreement in order to calculate what was owed after the patents expired under their legal theory. And you don't get there under Paragraph 6. What would have prevented you or I guess anyone who had a similar type of agreement from stockpiling and then selling afterwards? Well, first of all, Your Honor, Justice Posner correctly held in Minnesota law, Minnesota contract law, says a harsh result is no justification to ignoring the terms of the written agreement when they're clear and unambiguous. So if they're complaining about a harsh result, that's not a legal basis to enforce the contract. Secondly, the unforeseen concerns of the patent. is the three things that I mentioned earlier. One, they had a self-help remedy. If they saw us not selling product from our inventory, they only had to supply to our actual needs and what they could reasonably supply. So the reasonableness prong and our actual needs was the ability for them to say, no, I'm not going to supply you anymore. So you're telling me that your client didn't keep record, didn't have accurate records available of how many licensed products it made? Your Honor, these are leads and they're bundled and batched. And it's not that we don't have the auditors. We don't have an ordinary course of business, a way to reconcile. When you sell afterwards, there's different divisions in St. Jude. There's a selling division and manufacturing division. Yeah, right. Manufacturing division would, I would assume, most businesses would keep accurate records as to what they manufactured and as to what they sold. Right. We have gross numbers. But the problem is you can't do it on a product-by-product basis. And they admit that. We gave them, we weren't obligated to give them full access, but we said, here. And it shows that they did not have, there's not the documentation where they can reconcile as an auditor what was owed afterwards. All they could do was estimate based upon these general numbers on the 10-Qs, 10-Ks, and sales reports and invoices and trying to juxtapose. And then there's a big argument about what assumptions and premises their audit report was doing to get to that estimate. It wouldn't be that way. If we had an obligation to pay for products made, we would have an obligation to report the products made. It doesn't exist. If we had an obligation to calculate royalties based on sales after the patent expired for what was made earlier, we would still have that obligation so that people could audit it. In paragraph 6, plainly and unexpressed, it says that our obligation ends at the time of the agreement, the determination. There's no dispute under paragraphs 8 and 25 when the patent's expired. What we bargained for was quarterly payments for six years between when they signed this and when the patent's expired. That is irrational and illegitimate. Is there something unique about this product that that would be the type of agreement you would enter into? It's just what the parties bargained for. You had sophisticated parties on both sides. And they could easily use the word made if they intended to use the word made. They could have easily put licensed product in the first sentence of the royalty obligation if that's what they meant. What they meant was you're getting a license for a bundle of rights for all activity. And then you're going to sign these confirmation forms. And you get a right to sell, a right to use, and a right to make. And the confirmation form didn't have them report what was made or what was used. It only had them report what was sold. And it clearly was only during the term of the agreement. That is the only way you can read paragraphs 5, 6, and 8, and 25. Okay. You're yelling again. And you're over your time. So why don't you go ahead. Does anyone have any other questions? Thank you. Thank you. Your Honor, I've got two. There was an alternative ground. One minute? I thought he was over. I says here I've got two minutes? No. You are over two minutes. Oh, okay. Be brief. What is it that you want to say? The first principle, the alternative grounds that the trial court, there was two alternative grounds. The judge reached one of them and didn't reach the other. The alternative ground that the trial court read was rejecting this notion that there's a presumption under patent law that you are going to pay for each licensed product sold. There is no presumption under patent law. The federal circuit corroborated the district court in that. The question here is state law. Did you contract for it? And the trial court got it right. The first principle is if you want it, you have to contract for it. All right. Okay. And then the second point is the course of dealing. If we missed a royalty payment and a royalty report after the contract, after the patents expired, they would have called and told us. All right. Thank you, counsel. Thank you. Just very briefly, Your Honors. I'll point out that if, in fact, it's $3 million at stake, the royalty generated for six years of the agreement was $10 million. The estimate of the outstanding royalty is $3 million. That suggests there could have, in fact, been significant stockpiling just prior to termination of the patents. We don't know. I think none of what my colleague suggested about the audit is in the record. The audit itself is in the record. But St. Jude has an obligation, and we've cited to, excuse me, in footnote 2 of our reply brief, the obligation under 21 CFR Section 820.184, FDA requires that every single implantable medical product travel with its date of manufacture. So we believe it will be, in fact, contained in the records and absolutely calculable to identify the products made during the term of the patents and sold later. So how do you respond to his argument about Section 6B and the reporting requirements? It's inconsistent with what actually happened, counsel suggesting that the patents expire and all of a sudden all obligations terminate. We got an audit report a month after the patents expired and a payment. We're simply asking for that same conduct continuing with respect to any products that remain in inventory. There is Paragraph 8 of the agreement on the term, which in Part B requires not only expiration of the full term of the license granted and for any licensed product, but also full payment of the royalties. And the plain language that we're relying on is the language in B1 and B2 that says the payment is for net sales of licensed products. That's the royalty obligation. All right. Thank you, counsel. Pacesetter v. Cermatics is submitted.
judges: Noonan, Wardlaw, Murguia